UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STORMBORN TECHNOLOGIES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> TOPCON POSITIONING SYSTEMS, INC., <br><br> Defendant. | Case No. 19-cv-07804-WHO <br><br> **ORDER DENYING MOTION TO DISMISS** <br><br> Re: Dkt. No. 35 |

Plaintiff Stormborn Technologies LLC ("Stormborn") brings this patent infringement action against Topcon Positioning Systems, Inc. ("Topcon"), alleging that Topcon's products infringe on Claims 11 through 14 of its patent, US RE44,199 ("the '199 Patent"), titled "Variable Throughput Reduction Communications System and Method". Topcon moves to dismiss Stormborn's complaint on grounds that the patent claims ineligible subject matter under 35 U.S.C. § 101.

Representative Claim 11, considered in light of the specification, is not functionally defined without a specific implementation; it is tied to a concrete structure, the command processor. And if it was directed to an abstract idea, it still provides a specific technological solution that improves the way spread-spectrum communication systems operate. For these reasons, Topcon's motion to dismiss under section 101 is DENIED.

**BACKGROUND**

**I. THE PARTIES AND THE ACCUSED PRODUCT**

Stormborn alleges that Topcon infringes Claims 11 through 14 of its '199 Patent. First Amended Complaint ("FAC") ¶¶ 1, 4 [Dkt. No. 30]. In particular, it accuses "Topcon's 3D-MCMAX Integrated 3D Dozer" system ("Accused Product"), which is a "receiver for recovering

wireless data conveyed in data symbols by a plurality of different subchannel signals transmitted over a wireless channel." *Id.* at ¶ 56.

Stormborn initially brought this action on November 27, 2019. Complaint [Dkt. No. 1]. After Topcon moved to dismiss the Complaint for failure to state a claim on the grounds that the '199 Patent is directed to patent ineligible subject matter, Stormborn filed its FAC. Topcon's renewed motion to dismiss the FAC is before me now. Defendant's Renewed Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim ("MTD") [Dkt. No. 35].

## II. THE '199 PATENT

The United States Patent and Trademark Office issued the '199 Patent to Linex Technologies, Inc ("Linex") and Stormborn subsequently received all rights, title and interest in the patent. FAC ¶¶ 10, 11. The '199 Patent is comprised of 49 claims and relates to communications, particularly spread-spectrum communication systems. FAC, Ex. 1 ("'199 Patent") [Dkt. No. 30-1] 2:11-15. Along with its FAC, Stormborn submitted a declaration by Dr. Donald L. Schilling, who was the Chief Executive Officer of Linex during the development of the '199 Patent (and still is). FAC ¶ 12; *see id.*, Ex. B, Declaration of Dr. Schilling (Schilling Decl.") [Dkt. No. 30-2] ¶ 12. The declaration provides background information relevant to the '199 Patent.

In telecommunication and radio communication, spread-spectrum techniques are methods by which a signal (e.g., an electrical, electromagnetic, or acoustic signal) generated with a particular bandwidth is deliberately spread in the frequency domain, resulting in a signal with a wider bandwidth. Schilling Decl. ¶ 12. These techniques are used for a variety of reasons, including the establishment of secure communications and increasing resistance to natural interference. *Id.*

As identified in the specification, previous packet-communications spread-spectrum multi-cell systems implement high speed data through the use of parallel channels, using parallel chip-sequence signals. '199 Patent at 1:37-41; Schilling Decl. ¶ 13; FAC ¶ 15. The chip-sequence signals are sent simultaneously, thereby increasing the data rate while still having a high processing gain through the use of multiple correlators or matched fibers. '199 Patent at 1:41-44.

2

The prior art systems ensure that interference is small enough so as not to cause the error rate of the wanted signal to deteriorate below a usable level. *Id.* at 1:50-54. However, when a remote station is near the edge of a cell, the interference can be substantial because the interference can result from two adjacent cells. *Id.* at 1:55-56; *see also id.* at Figure 1. Thus, the specification identifies a continued need to be solved within computer centric or network centric technology – the reduction of the signal interference that can occur due to two adjacent cells.

The specification describes the shortcomings of prior attempts to overcome this problem. One previous method was to increase the processing gain in order to increase the immunity from interference. '199 Patent at 1:58-61. However, this method changes the length of the correlator sequence, or changes the size of the matched fiber; both of which impact the architecture of the receiver. *Id.* at 1:63-66. This methodology also requires the chip-tracking loop and phase-tracking loop to function flawlessly and reduces the allowable frequency offset. *Id.* at 1:66-2:3. Another prior attempt to solve this problem was to repeat the symbols sequentially and add the result of the individual received symbols, but this method changes the timing of the receiver and the framing of the data at the transmitter. *Id.* at 2:6-7.

Stormborn alleges that the invention claimed in the '199 Patent addresses these needs and inefficiencies by providing an improved communication system. FAC ¶ 18. It claims that the receiver of Claim 11 (and its method Claim 13) is an improvement on prior solutions because it overcomes a "network centric problem" in a way that is different from the prior art. *See* FAC ¶¶ 27, 36, 40, 41. Claim 11 describes a "receiver for recovering wireless data conveyed in data symbols," comprising of a "demodulator circuitry[,]" "decoder circuitry[,]" "command processor circuitry[,]" "transmitting circuitry[,]" and "multiplexer circuitry[.]" '199 Patent at 11:26-45. Stormborn asserts that the receiver is an improvement on prior solutions because it adds a command processor circuitry. *Id.* at 3:59-64; FAC ¶ 24. The command processor circuitry is responsive to the error rate of the decoded channels to generate a data rate control signal to produce a desired data rate to be sent by the data symbol transmitter of the signals. FAC ¶ 24; '199 Patent at 11: 34-40; Schilling Decl. ¶ 26. A comparison between Figures 3 and 5 show the improvement made to the receiver and Figures 2 and 4 show the improvements made to the

3

1 transmitter. '199 Patent at 3:34-43.

2 Claim 13 covers a method of operation for the receiver in Claim 11. '199 Patent at 15:47-63. Claims 12 and 14 are dependent claims. Claim 12 is "[t]he receiver of claim 11 wherein the decoder circuitry includes circuitry to decode FEC codes of different rates" and claim 14 is "[t]he method of claim 13 wherein the decoding step includes decoding FEC codes of different rates." *Id.* at 15:46-47 and 15:64-65.

Stormborn also alleges that the '199 Patent highlighted this unique and discrete idea during its prosecution. FAC ¶ 25. Namely, that Claims 11 and 13 are not directed to an abstract idea because the invention "was able to overcome a network-centric problem that existed in the prior art by allowing the receiver to maintain a high data rate without affecting the architecture of the receiver and maintain an immunity to interference." FAC ¶ 27; Schilling Decl. ¶ 24.

**LEGAL STANDARD**

**I.   MOTION TO DISMISS**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

4

2008).

The Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016). In such circumstances where it is possible and proper, "claim construction is not an inviolable prerequisite to a validity determination under [section] 101." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012).

## II. SECTION 101 ELIGIBILITY

Under section 101 of the Patent Act, "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . ." 35 U.S.C. § 101. The Supreme Court "has long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citing another source). This is so because "such discoveries are manifestations of . . . nature, free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (citations and internal quotation marks omitted). Patents that seek to wholly preempt others from using a law of nature or an abstract idea—"the basic tools of scientific and technological work"—are invalid. *Alice*, 573 U.S. at 216. "Accordingly, in applying the [section] 101 exception, we must distinguish between patents that claim the buildin[g] block[s] of human ingenuity and those that integrate the building blocks into something more, thereby transform[ing] them into a patent-eligible invention." *Id.* at 217 (internal citations and quotation marks omitted).

Courts apply a two-step framework for analyzing whether claims are patent eligible. *Id.* First, "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* According to the Federal Circuit, "the first step of the inquiry is a meaningful one . . . and cannot simply ask whether the claims *involve* a patent-ineligible concept . . . ." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (alteration in original). "Rather, the 'directed to' inquiry applies a stage-one filter to claims, considered in light

5

of the specification, based on whether their character as a whole is directed to excluded subject matter." *Id.* (internal quotation marks omitted).

If the claims are directed to a patent-ineligible concept, courts proceed to step two to "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* at 1334 (internal citations and quotations omitted). This step requires a "search for an inventive concept – *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217-18 (internal quotation marks and citations omitted).

## DISCUSSION

The parties do not dispute that Claim 11 of the '199 Patent is representative of independent Claims 11 and 13. MTD 12; Plaintiff Stormborn Technologies, LLC's Opposition to Defendant Topcon Positioning Systems, Inc.'s Motion to Dismiss the Complaint ("Oppo.") [Dkt. No. 39] 2. Claim 11 recites:

> 11. A receiver for recovering wireless data conveyed in data symbols by a plurality of different subchannel signals transmitted over a wireless channel, comprising:
> 
> demodulator circuitry for detecting the transmitted signals in a plurality of demodulated channels;
> 
> decoder circuitry for FEC decoding and de-interleaving the plurality of demodulated channels, providing a multiplicity of decoded channels, each having an error rate;
> 
> command processor circuitry responsive to the error rate of the decoded channels for generating a data-rate control signal to produce a desired data rate to be sent by the data symbol transmitter of the signals, the data rate control signal controlling operation of circuitry at the transmitter to produce the desired data rate to be sent by the data symbol transmitter of the signals;
> 
> transmitting circuitry for conveying the error rate dependent rate control signal back to the data symbol transmitter; and
> 
> multiplexer circuitry for combining the multiplicity of decoded channels into a signal stream of received data.

'199 Patent at 11:26-45. The dispute before me is whether representative Claim 11, in particular the "command processor" component, covers patent-ineligible subject matter. Because the '199 Patent is tied to concrete structures and directed towards a specific improvement in the way spread-spectrum communication systems operate, Topcon's motion to dismiss under section 101

is DENIED.[1]

I.   *ALICE* **STEP ONE**

Although the "precise contours" of the first step are not clear, it requires me to decide whether Claim 11 is "directed to" patent eligible or ineligible subject matter. *See Cellspin Soft, Inc. v. FitBit, Inc.*, 927 F.3d 1306, 1315 (Fed. Cir. 2019). As a threshold issue, Topcon contends that representative Claim 11 is directed to the "abstract idea" of "throttling a data stream when it becomes unmanageable"; put differently, that Claim 11 embodies the simple idea of slowing down information when it comes in too fast and cannot be processed accurately. MTD 5, 13, 14. But Topcon describes the abstract idea in a way that is untethered to the claim language. It approaches the claims at too high a level of generality, which the Federal Circuit explicitly warns against. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("[D]escribing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to [section] 101 swallow the rule."). Rather, the claims are to be read as a whole in light of the specification.[2]

Topcon makes the following three arguments as to representative Claim 11: (i) it is functionally defined without a specific implementation; (ii) it does not improve computers as tools; and (iii) simply limiting it to a technical and wireless environment does not make it non-abstract. MTD 14-19.

**A.   Claim 11 is Not Functionally Defined Without a Specific Implementation**

The Federal Circuit has directed courts to "look to whether the claims focus on a specific means or method, or are instead *directed to a result or effect* that itself is the abstract idea and

---

[1] Topcon also argues that the dependent claims 12 and 14 have the same flaws as the independent claims —they are directed to the "abstract idea of throttling a data stream when it becomes unmanageable" – and therefore should be treated as independent claims. MTD 20-21. This argument fails for the same reasons discussed in evaluating representative Claim 11.

[2] Despite Topcon's assertion, it is appropriate to "examine the claims in light of the written description" in performing this analysis. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016); *see also Enfish*, 822 F.3d at 1335; *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611-15 (Fed. Cir. 2016). The claims themselves detail the structure of the system and the specification explains how the claimed invention improves the functioning of the spread-spectrum system compared to prior art.

7

merely invokes generic processes and machinery." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (emphasis added). Topcon argues that Claim 11 is fully functional because it is directed to an abstract end-result and lacks any specificity necessary to recite how the claimed function is achieved. MTD 14. In its view, Claim 11 requires only that well-known prior art components perform their conventional functions in connection with the undefined command processor; in other words, these components are defined by their result rather than any specific description of how they are to operate. *Id.* at 15. It analogizes this case to the claims in *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017), where the court found that the claims "recite both a generic computer element—a processor—and a series of generic computer 'components' that merely restate their individual functions—*i.e.*, organizing, mapping, identifying, defining, detecting, and modifying."

But Claim 11 is not merely result-oriented. Rather, it is tied to the command processor, with the specific goal of improving the functionality of spread-spectrum communication systems. The specification reviews the shortcomings of prior attempts to fix the interference that can result from two adjacent cells. '199 Patent 1:50-2:7. It claims that the added "command processor" to a parallel spread-spectrum system solves this problem by producing a "desired-data rate." *Id.* at 3:59-64. As described in the language of Claim 11, the command processor component in the receiver "generat[es] a data-rate control signal to produce a desired data rate to be sent by the data symbol transmitter of the signals." *Id.* at 11:35-37. The data control signal is generated based on the "error rate of the decoded channels." *Id.* at 11:34-35. In particular, the "data rate control signal" is defined as "controlling operation of circuity at the transmitter to produce the desired data rate to be sent by the data symbol transmitter of the signals." *Id.* at 11:37-40. The comparison between Figures 3 and 5 explains how this modification improves on prior art and solves the interference problem caused by remote stations placed at the edge of a cell. *See id.* at 7:26-33. These elements remove the claims from the realm of abstract ideas.

Therefore, the '199 Patent explains how the claimed invention is an improvement from prior art spread-spectrum communication systems and focuses on the elements that provide benefits over prior art. *See Enfish*, 822 F.3d at 1335 (finding the "focus of the claimed advanced

over the prior art" can inform the "directed to" inquiry in *Alice* step 1). Topcon's assertion that Claim 11 does not describe *how* the desired result of controlling the data rate is achieved by the command processor is better suited for a validity challenge based on lack of enablement under 35 U.S.C. § 112.[3]

### B. Claim 11 Improves Prior Spread-Spectrum Communication Systems

Similar to its first argument, Topcon contends that Claim 11 does not claim specific means to improve or solve specific computer problems because it is described in purely functional terms and does not provide limiting detail to confine it to a particular solution. MTD 17. Contrary to Topcon's high-level abstraction untethered to the claims, the claimed receiver device in Claim 11 is directed to improving the functionality of spread-spectrum communication systems – it claims to improve immunity from interference that can result when a remote station is at the edge of a cell. '199 Patent at 2:13-15.

The specification explains how prior art systems did not adequately solve this problem. *See id.* at 1:58-2:7 (prior solutions would impact the architecture of the receiver or change the timing of the receiver or framing of the data at the transmitter). It identifies a continuing need to be solved within a computer centric or network centric technology and why its invention is better than prior less efficient solutions to fix the problem. *See Rapid Litg. Mgmt. v. CellzDirect*, *Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016) (stating that "new and improved technique, for producing a tangible and useful result, falls squarely outside those categories of inventions that are 'directed to' patent-ineligible concepts").

Topcon's attempt to distinguish this case from claims that the Federal Circuit has held to

---

[3] In its reply, Topcon reasserts its argument that Claim 11 contains "results-oriented [] language, without any explanation of how to achieve the result," and therefore is impermissible under section 101. Defendant's Reply in Support of its Renewed Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim ("Reply") [Dkt. No. 41] 3. It cites to *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015), where the court affirmed the district court's finding that "claim 1 is directed to the idea itself" because "claim 1 contains no restriction on how the result is accomplished." *Id.* Unlike that case, Claim 11 lays out the components needed to accomplish the claimed invention. *See* '199 Patent at 11:26-45. Whether or not these steps are specific enough to detail *how* to implement the claimed invention is better suited for a challenge under section 112. *See, e.g.*, *Avocent Huntsville, LLC v. ZPE Sys., Inc.*, No. 3:17-CV-04319-WHO, 2018 WL 1411100, at *8 (N.D. Cal. Mar. 21, 2018), *appeal dismissed,* No. 18-1881, 2018 WL 5276289 (Fed. Cir. Aug. 3, 2018).

be eligible is unconvincing. *See Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) (claims were patent-eligible because "[i]mproving security . . . can be a non-abstract computer-functionality improvement . . . done by a specific technique that departs from earlier approaches to solve a specific computer problem"); *Finjan, Inc. v. Blue Coat Sys.,* 879 F.3d 1299, 1305 (Fed. Cir. 2018) (claims were sufficient improvement in computer functionality to render claims patent-eligible because the security profile approach went beyond traditional "code-matching" systems and could be used to protect against previously unknown viruses and permitted more flexible and nuanced virus filtering); *Enfish,* 822 F.3d at 1336 (claims were not directed at an abstract idea because the "plain focus of the claims is on an *improvement to computer functionality itself*, not on economic or other tasks for which a computer is used in its ordinary capacity") (emphasis added).

Similar to *Ancora*, *Finjan* and *Enfish*, Claim 11 solves a specific network centric problem by adding a command processor to the receiver, which improves the functionality of spread-spectrum communication systems as it solves the interference problem in a way different than prior art. This makes it distinguishable from *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016), where the claims were not directed to a specific improvement to computer functionality, but rather "directed to the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining [two components]."

### C. Claim 11 Does Not Simply Limit Itself to an Environment

The Federal Circuit makes clear that limiting claims to a particular technological environment is, without more, insufficient to transform them into patent-eligible claims. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). Contrary to Topcon's contention, Claim 11 does not simply limit itself to a technical and wireless environment. MTD 18. Instead, as discussed above, Claim 11 is directed to a specific improvement in spread-spectrum communication systems. For these reasons, Claim 11 is not directed to an abstract idea.

### II. *ALICE* STEP TWO

Even if I were to find that Claim 11 is directed to an abstract idea under step one, it can

10

still be patent eligible if it provides an inventive concept that "entail[s] an unconventional technological solution … to a technological problem." *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016). Stormborn asserts that the claimed invention includes inventive concepts because it

> provides specific non-conventional and non-generic arrangements of known, conventional pieces to overcome an existing problem; provides ordered combination of claimed steps in the receiver using unconventional rules that are different than previously used; and provides improved technological results.

FAC ¶ 29.

Topcon argues that there is nothing inventive about using "well known" components to perform their regular function by an "unspecified method." MTD 19. But when viewed as an ordered combination, they do reveal a non-conventional and non-generic arrangement of known, conventional pieces that provide an inventive step. *Amdocs*, 841 F.3d at 1302 ("Claim 1 involves some arguably conventional components (e.g., gatherers), but the claim also involves limitations that when considered individually and as an ordered combination recite an inventive concept through the system's distributed architecture.").

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) in particularly instructive here. Although "[f]iltering content on the Internet was already a known concept," the patent in that case "describe[d] how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content." 827 F.3d at 1350. It explained that prior art filters were susceptible to certain drawbacks, but the claimed invention improved on the existing technological process. *Id.* at 1351. In construing the claims in favor of the nonmovant, the Federal Circuit found that the claims were "more than a drafting effort designed to monopolize the abstract idea," and rather were patent-eligible under step two because they "provid[ed] a specific technological solution beyond simply using generic computer concepts in conventional way." *Id.* at 1351-52.

Similarly, even if I construe claim 11 as directed to an already-known concept of "throttling a stream of information," the '199 Patent describes how its particular arrangement of elements improves over prior art methods of reducing interference that can result from two

11

adjacent cells. '199 Patent 1:55-56. The specification describes the shortcomings of previous attempts to solve this problem. For example, one previous method was to "increase the processing gain in order to increase the immunity from interference," but this "changes the length of the correlator sequence, or changes the size of the matched fiber, both of which impact the architecture of the receiver." *Id.* at 1:59-51 and 1:64-66. This method would also require "the chip-tracking loop and phase-tracking look [to] function flawlessly." *Id.* at 1:67-2:1. Another previous method was to "repeat the symbols sequentially and add the result of the individually received symbols," but this method "changes the timing of the receiver and the framing of the data at the transmitter." *Id.* at 2:4-7.

The claimed invention improves on the existing technological process by "control[ling] a data rate of a spread-spectrum transmitter from a spread-spectrum receiver, using a closed loop method." *Id.* at 2:16-18. In particular, the claimed arrangement of the elements and addition of a command processor in Claim 11 improves interference immunity in a manner that was unknown to the existing prior art communication networks. FAC ¶¶ 33-34; *see, e.g.*, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59 (Fed. Cir. 2014) (patent satisfied *Alice* step two because it claimed a technical way to satisfy an existing problem for website hosts and viewers by taking a prior art filter solution and making it more dynamic and efficient).

Stormborn also alleges that Claim 11 (and its method of Claim 13) provides other benefits over conventional receivers "including increased flexibility, faster transmission times and data transfer, as well as reduced manufacturing requirements." FAC ¶ 35. Although these benefits over prior art are not clearly stated in the specification, the Federal Circuit has "repeatedly cited allegations in the *complaint* to conclude that the disputed claims were potentially inventive." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019), *cert. denied sub nom. Garmin USA, Inc. v. Cellspin Soft, Inc.*, No. 19-400, 2020 WL 129574 (U.S. Jan. 13, 2020) (emphasis in original). "As long as what makes the claims inventive is recited by the claims, the specification need not expressly list all the reasons why this claimed structure is unconventional." *Id.*; *see also id.* at 1318 (finding district court erred by not accepting as true allegations about why aspects of the claimed inventions were not conventional).

To the extent that Topcon argues that the invention here involves "well-understood, routine, and convention activities," those are factual disputes that preclude dismissal at this stage. *See Cellspin*, 927 F.3d at 1318 ("[F]actual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under [section] 101."). Accepting Stormborn's allegations as true and viewing the representative Claim 11 in light of the specification, the '199 Patent contains an inventive concept that make it patent eligible even if it is directed to an abstract idea.[4]

## CONCLUSION

For the reasons stated above, Topcon's motion to dismiss on grounds that the '199 Patent claims ineligible subject matter under 35 U.S.C. § 101 is DENIED.

**IT IS SO ORDERED.**

Dated: March 17, 2020



William H. Orrick
United States District Judge

---

[4] Once again, Topcon emphasizes its view that the patents fail to explain *how* to accomplish the claimed invention. *See* MTD 19; Reply 5. As explained above, this argument is more appropriately addressed in a validity challenge under section 112 rather than an attack on patent eligibility under section 101.